AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
4/19/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___TV___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
4/19/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jm___ DEPUTY

United States of America

v.

AARON GUADALUPE SOTELO-MONTOYA,

Defendant(s)

Case No.  2:23-mj-01876

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 17, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Tyler Dominguez
Complainant's signature

Tyler Dominguez, Task Force Officer
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 4/19/23

City and state: Los Angeles, California

Judge's signature

Hon. Michael R. Wilner, U.S. Magistrate Judge
Printed name and title

AUSA: Kyle W. Kahan (x2238)

**AFFIDAVIT**

I, Tyler Dominguez, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Aaron Guadalupe SOTELO-MONTOYA ("SOTELO-MONTOYA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) (possession with intent to distribute fentanyl).

2. This affidavit is also made in support of an application for a warrant to search the following digital device, in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described in Attachment A: a dark blue Motorola, Moto G cellular device, with IMEI 357160654576959 (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of

or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I have been a Police Officer for the past nine years, currently serving with the El Monte Police Department.  I have worked uniformed patrol, gang enforcement and, currently, I am a Task Force Officer assigned to the Drug Enforcement Administration ("DEA"), Los Angeles Field Division, Group 5 ("LAFD").

6.   I have received 40 hours of narcotics training in recognition, packaging for distribution, use, and the effects of narcotics and other dangerous drugs from the San Bernardino County Sheriff's Academy.  I have received specific training focusing on the impact Mexican Criminal and Drug Trafficking Organizations are having locally throughout the United States, including in California.  This course focused on the strategic overview of the Mexican "Narco" Cartels and emerging trends and updates of the Cartel hierarchy, leadership, and operations within the United States.

7.   I have conducted numerous arrests and investigations related to narcotics users, dealers, and associates.  These investigations and arrests have led to cultivating narcotic users and informants as well as providing drug influence intervention resources to drug addicts.

8.   To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical surveillance and the use of various types of

2

informants and cooperating sources. Through these investigations, and my training and experience, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect/launder narcotic related proceeds. My knowledge of these tactics, which include the utilization of debit calling cards, public telephones, the use of couriers to transport narcotics, cellular telephone technology, beepers, counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations has been particularly useful and relevant to this investigation.

## SUMMARY OF PROBABLE CAUSE

9. On or about April 17, 2023, the El Monte Police Department conducted a traffic stop on a car driven by Aaron Guadalupe SOTELO-MONTOYA. A search of the vehicle led to the discovery of approximately one pound of methamphetamine in the glove box and approximately 100,000 fentanyl pills concealed in a suitcase in the car's back seat area.

## STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, body camera footage, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   **A.  El Monte Police Officers Discover Methamphetamine and Fentanyl Inside a Car Driven by SOTELO-MONTOYA**

11. On or about April 17, 2023, at approximately 12:47 p.m., El Monte Police Department Officer Brandie Gonzalez was

working uniformed patrol and was driving a marked El Monte Police patrol vehicle on eastbound Garvey Avenue near Merced Avenue in El Monte, California.

12.  At that time, Officer Gonzalez saw a black, BMW 28I bearing California license plate 9DEK122 with no front license plate in violation of California Vehicle Code 5200(a).  Officer Gonzalez also saw two of the BMW's side windows were tinted in violation of California Vehicle Code 26708(a)(1).  As Officer Gonzalez was driving next to the BMW, she noticed it began to slow to approximately 15 miles per hour.  The speed limit on Garvey Avenue is 35 miles per hour.

13.  Based on the above California Vehicle Code violations, Officer Gonzalez initiated a traffic enforcement stop on the BMW.  Officer Gonzalez contacted the driver and sole occupant, SOTELO-MONTOYA, who stopped the vehicle in a Chevron gas station parking lot located at 10308 Garvey Avenue.

14.  Officer Gonzalez approached the BMW and contacted SOTELO-MONTOYA.  Officer Gonzalez asked SOTELO-MONTOYA to roll down his window.[1]  SOTELO-MONTOYA complied.  Officer Gonzalez asked SOTELO-MONTOYA for his driver's license, insurance, and registration.  SOTELO-MONTOYA said he did not possess a driver's license.[2]  Officer Gonzalez confirmed through a DMV records check

---

[1] All conversations with SOTELO-MONTOYA were in the Spanish language.  Officer Gonzalez is a Spanish-speaking officer.  I have reviewed all body camera footage and recorded statements, which have been translated to me by a Spanish-speaking DEA employee.

[2] Driving without a license is a violation of California Vehicle Code, Section 12500(a), a misdemeanor.

4

that SOTELO-MONTOYA did not have a valid driver's license and had him step out of the BMW pending further investigation.

15. Once SOTELO-MONTOYA was outside the BMW, Officer Gonzalez asked if he had any drugs in the car. SOTELO-MONTOYA said he did not. Officer Gonzalez then asked SOTELO-MONTOYA for permission to search his car. SOTELO-MONTOYA consented to the search, which is captured on body camera video. During the subsequent search, SOTELO-MONTOYA remained seated on a nearby curb.

16. Officer Gonzalez began to search the BMW and located a grey Adidas duffle bag on the front passenger side floorboard. Inside of the bag, Officer Gonzalez found a clear, plastic zip-lock bag containing approximately ten live .45mm ammunition rounds. Officer Gonzalez requested a nearby officer handcuff SOTLEO-MONTOYA for officer safety reasons due to the discovery of live ammunition in the car.

17. Officer Gonzalez continued to search the BMW. During her search, Officer Gonzalez located a turquoise-colored suitcase on the right rear passenger side floorboard. Officer Gonzalez opened the suitcase and located approximately one-hundred clear bags which contained small, blue pills. The pills had the letter "M" on one side of the pill and "30" on the other side of the pill. Each of the clear bags had a "1" on them. The following is a photograph of the opened suitcase taken by an El Monte Police Department officer:



18.     Based on my training and experience in the field of narcotics, I know "M30" pills often are laced with fentanyl, a dangerous and potentially deadly narcotic.

19.     Officer Gonzalez continued to search the BMW.  In the back compartment area of the glove compartment, Officer Gonzalez located a clear plastic bag containing a crystalline substance consistent with methamphetamine.

20.     Officer Gonzalez arrested SOTELO-MONTOYA after concluding her search.  Officer Luis Mijangos searched SOTELO-MONTOYA incident to arrest and located SOTELO-MONTOYA's wallet inside of his pants.  Inside of the wallet was approximately $1,904 in United States currency.  Officer Mijangos placed SOTELO-MONTOYA in the backseat of his patrol car and transported him to the El Monte Police Department jail for booking.  The BMW was towed and stored pursuant to California Vehicle Code 22651(h)(1) and El Monte Police policy and procedures.

21.     During the search of the vehicle officers seized the SUBJECT DEVICE.

**B.     SOTELO-MONTOYA Says He Transported the Suitcase Containing Fentanyl on Behalf of a Mexican Cartel but Denied Knowledge of Its Contents**

22.     Once at the El Monte Police Department jail, Officer Mijangos[3] read SOTELO-MONTOYA a <u>Miranda</u> admonition. SOTELO-MONTOYA acknowledged his rights and elected to speak with Officer Mijangos.

23.     During their conversation, SOTELO-MONTOYA told Officer Mijangos that he was from Sinaloa, Mexico, and came to the United States approximately three years earlier. SOTELO-MONTOYA said he was transporting the BMW from Phoenix, Arizona, to Seattle, Washington.

24.     SOTELO-MONTOYA said he saw the suitcase inside of the BMW and assumed there were narcotics inside. However, he claimed he did not look inside the suitcase to confirm. SOTELO-MONTOYA admitted to possessing the glass pipes, methamphetamine, and ammunition. SOTELO-MONTOYA claimed that the methamphetamine was for his own use and that he would smoke it. SOTELO-MONTOYA denied knowing what was inside of the suitcase.

**C.     The Recovered Contraband Includes Approximately 100,000 Fentanyl Pills and One Pound of Methamphetamine**

25.     I, along with El Monte Police Detective Duran opened one bag of the M30 pills and counted approximately 1,000 pills. All the bags were approximately the same size, and all had the marking "1" on them. There were 100 bags containing approximately 100,000 pills. DEA Special Agent Gerald West

---

[3] The conversation between Officer Mijangos and SOTELO-MONTOYA was in the Spanish language. Officer Mijangos is a Spanish-speaking officer. I have reviewed Officer Mijangos' body camera footage of the conversation with a Spanish-speaking DEA employee who translated it for me.

weighed approximately 10 of the recovered bags containing the blue pills.  The total weight of the 10 bags was approximately 1,270.06 grams gross.  The remaining bags containing the blue pills were consistent in shape and size as the weighed bags.

26.  I weighed the recovered suspected methamphetamine at the El Monte Police Department.  The suspected methamphetamine weighed approximately one pound gross.

27.  Detective Duran conducted TruNarc field tests on the suspected fentanyl and methamphetamine in my presence.  The suspected methamphetamine tested presumptive positive for methamphetamine.  The suspected fentanyl tested presumptive positive for acetaminophen.  I know through my training and experience that fentanyl, specifically blue M30s, test positive for acetaminophen using the TruNarc field test.

28.  The currency located in SOTELO-MONTOYA'S wallet totaled $1,904.

29.  I took a photograph of the recovered contraband.  Below is a copy of the photograph:



8

### III. TRAINING AND EXPERIENCE ON DRUG OFFENSES

30. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these

9

photos to each other and others to boast about the drugs or facilitate drug sales.

  d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

  e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

  f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

  g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

  h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

31. As used herein, the term "digital device" includes the SUBJECT DEVICE.

32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

11

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

        33.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c. It is also likely that a significant portion of the digital data to be reviewed will be in a language other than English, for which reviewers may need a translator.

34. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition

13

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.  The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SOTELO-MONTOYA's thumb and/or fingers on the devices; and (2) hold the devices in front of SOTELO-MONTOYA's face with his eyes open to activate the facial-, iris- , and/or retina-recognition feature.

    35.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

14

## V. CONCLUSION

36. For all of the reasons described above, there is probable cause to believe that Aaron Guadalupe SOTELO-MONTOYA has committed a violation of 21 U.S.C §§ 841(a)(1), (b)(1)(A)(vi) (possession with intent to distribute fentanyl). There is also probable cause that the items to be seized in Attachment B will be found in the SUBJECT DEVICE, described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
April, 2023.

_____
THE HON. MICHAEL R. WIENER
UNITED STATES MAGISTRATE JUDGE